## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**UNITED STATES OF AMERICA**

v.

**HÉCTOR RÍOS-ORAMA**,
Defendant.

Criminal No. 22-174 (RAM/BJM)

## REPORT AND RECOMMENDATION

Héctor Ríos-Orama ("Ríos-Orama") is charged with one count of carjacking in violation of 18 U.S.C. § 2119(1). Docket No. ("Dkt.") 3. He moved to suppress the victim's identification of him in a lineup. Dkt. 28. The government opposed, Dkt. 42, Ríos-Orama replied, Dkt. 47, and the government surreplied. Dkt. 53. Ríos-Orama also moved to suppress evidence seized during the search of a residence in San Lorenzo, Puerto Rico, Dkt. 36, which the government likewise opposed. Dkt. 62. Both motions were referred to me for a suppression hearing and a report and recommendation. Dkts. 55, 63. I held a suppression hearing on June 16, 26, and 30, 2023, Dkts. 73, 74, 75, at which the parties submitted exhibits. Dkts. 76, 77. For the reasons below, Ríos-Orama's motions should be **DENIED**.

## BACKGROUND

The following account of the facts is drawn from the testimonial and documentary evidence received at the hearing. The government presented as witnesses Puerto Rico Police Department ("PRPD") Agent Francisco Cortés ("Agent Cortés"), Efraín Delgado-Rodríguez ("Delgado-Rodríguez"), PRPD Agent Francisco Javier Fonseca-Pérez ("Fonseca-Pérez") and PRPD Agent Edwin Zayas-Roldan ("Agent Zayas-Roldan"). Ríos-Orama presented the following witnesses: PRPD Officers Héctor M. Rivera-Rosa ("Rivera-Rosa"), Juan G. Báez-Vázquez ("Báez-Vázquez"), Jose D. Campos-De Alba ("Campos-De Alba"), and Edgar X. Rivera-Rivera ("Rivera-Rivera"). Further, Ríos-Orama testified on his own behalf.

### The Carjacking

Around 3:00 p.m. on March 22, 2022, Carmen Díaz-Trinidad ("Díaz-Trinidad") parked her Nissan Pathfinder at a strip mall in San Lorenzo, Puerto Rico. *Cortés Test.* June 16, 2023; Gov. Ex. 1 at 5:40–6:00. As she exited the vehicle, a man wearing a baseball hat, facemask, reflective vest, blue or black shirt, and jeans waved to get her attention. *Id.* at 6:00–7:06. She later told police he signaled to her that her door was open. *Cortés Test.* June 16, 2023. While returning to her car to close the door, she felt a pull from behind. *Id.* A man then tried to grab her keys from her. *Id.*; Gov. Ex. 1 at 7:06–7:31. Díaz-Trinidad recognized him as the same person who waved at her moments earlier and realized he had a gun. *Cortés Test.* June 16, 2023. After this man forced her to the ground, he took her keys and purse and sped away in her vehicle. *Id.*; Gov. Ex. 7:06–7:55.

Bystanders called police and Agent Fonseca-Pérez arrived, followed by Agent Cortés. *Fonseca-Pérez Test.* June 26, 2023; *Cortés Test.* June 16, 2023. Officers did not interview Díaz-Trinidad at the scene because paramedics were treating her and they prioritized the 74-year-old's health. *Id.* Though Fonseca-Pérez submitted a report stating the complainant, Díaz-Trinidad, summarized the events to him, this information actually came from witnesses to the carjacking. Dkt. 77-1 at 11, 17; *Fonseca-Pérez Test.* June 26, 2023. Instead of interviewing Díaz-Trinidad, agents visited a Chinese restaurant, jewelry store, and Liberty cell phone store to view security footage. *Cortés Test.* June 16, 2023. *Id.* Agent Cortés also seized a blue Pepsi cup, straw, and plastic lid from a column in front of the Liberty store because surveillance footage showed the assailant drinking from a similar cup immediately before the carjacking. *Id.*; Gov. Ex. 3:55–4:25; Dkt. 76-1 at 1.

Agent Cortés interviewed Díaz-Trinidad the following day, March 23, 2023. *Cortés Test.* June 16, 2023. She stated she could observe her assailant well and described him as a tall, dark,

skinny person who wore a black shirt and an orange and yellow reflective vest. *Id.* She did not

mention he had a towel on his shoulder. *Id.*; Dkt. 76-1 at 2. Agent Cortés did not ask about the

attacker's eyebrows, forehead, or eye color and Díaz-Trinidad offered no information about these

features. *Cortés Test.* June 16, 2023.

### Ríos-Orama's Arrest

Agent Antonio Rosado arrested Ríos-Orama around 11:00 p.m. on March 24, 2023. *Id.*

Agent Cortés testified police arrested Ríos-Orama in Díaz-Trinidad's Nissan Pathfinder. *Id.* After

Agent Cortés read Ríos-Orama his *Miranda* rights, he asked Ríos-Orama where he lived and

contends Ríos-Orama replied that he was homeless. *Cortés Test.* June 16, 2023; Dkt. 76-1 at 7.

When Ríos-Orama refused to answer questions about the carjacking, police placed him in a cell

early in the morning on March 25th. *Id.* While completing necessary paperwork, police again asked

Ríos-Orama his address and Agent Cortés asserts Ríos-Orama again stated he was homeless. *Id.*;

Dkt. 76-1 at 10. While buying Ríos-Orama breakfast later that morning, Agent Cortés received a

call that he was in a delicate state of health and paramedics were summoned. *Cortés Test.* June 16,

2023. By the time Agent Cortés returned, paramedics were treating Ríos-Orama and taking his

vital signs. *Id.* At this time, paramedics asked Ríos-Orama for his address and he responded that

he lived on the street. *Id.*; Dkt. 76-1 at 13. Ríos-Orama ultimately declined further medical

treatment and said he was in pain due to drug withdrawals. *Cortés Test.* June 16, 2023; *Ríos-Orama

Test.* June 26, 2023.

Ríos-Orama remembers his arrest differently. I note that he testified he was using drugs on

the day he was arrested and would often be "out of it" for days at a time. *Id.* He says he was arrested

leaving his basement apartment in San Lorenzo. *Ríos-Orama Test.* June 26, 2023. He further

testified he never stated he was homeless and that officers never asked where he lived. *Id.* Instead,

he says they mocked him by inquiring why he was in San Lorenzo, a section of Caguas approximately 45 minutes south of San Juan, if he was from Manatí, a town approximately 45 minutes west Puerto Rico's capital. *Id.* He says he responded that he had recently been released from jail in Ponce and the only available place to stay was at the Los Peregrinos homeless shelter in Caguas. *Id.* He says he then explained that, while at Los Peregrinos, he met Delgado-Rodríguez who hired him and invited him to live in the San Lorenzo apartment. *Id.* Ríos-Orama maintains that he always gave PRPD agents this explanation when they asked about his living situation during their investigation. *Id.* Records from Ríos-Orama's March 25 appearance in Puerto Rico court regarding his stolen-vehicle-possession charge show that he was unrepresented by counsel and state his address is in Barceloneta, Puerto Rico although the source of this address is unclear. Dkt. 76-1 at 16.

### The San Lorenzo Apartment

Ríos-Orama's former employer and landlord, Delgado-Rodríguez, testified regarding his living situation. I note that Delgado-Rodríguez currently faces federal felony identity theft and bank fraud charges in an unrelated case. *Delgado-Rodríguez Test.* June 26, 2023; Crim. No. 22-136 (SCC). He also acknowledged skirting payroll taxes and Social Security deductions by paying Ríos-Orama and other employees off the books. *Delgado-Rodríguez Test.* June 26, 2023. He said he allowed Ríos-Orama to live in the basement of a house in San Lorenzo that he used as storage in the year leading up to Ríos-Orama's arrest. *Delgado-Rodríguez Test.* June 26, 2023. In exchange, he asked Ríos-Orama to repair the premises. *Id.* During this period, Delgado-Rodríguez said he entered and left the apartment with his own set of keys on a near-daily basis to pick up materials he was storing, some of which remained there when police searched the apartment after Ríos-Orama's arrest. *Id.* Delgado-Rodríguez said he would give Ríos-Orama practically no notice

before visiting because the pair were close friends. *Id.* He added he would often find Ríos-Orama sleeping and wake him up. *Id.* Though Ríos-Orama stopped working on the apartment, Delgado-Rodríguez never charged him rent or sought to evict him. *Id.* Ríos-Orama lived with a girlfriend for a few months but Delgado-Rodríguez testified he told Ríos-Orama she needed to move out and Ríos-Orama complied with this demand. *Id.* Delgado-Rodríguez also contends that he allowed another of his employees to live in the apartment for a few months without asking Ríos-Orama's permission. *Id.* That employee's stay ended when Delgado-Rodríguez fired and evicted him for stealing company tools. *Id.*

In late February 2022, Delgado-Rodríguez suspected Ríos-Orama of this same behavior, and Ríos-Orama disputed this accusation with Delgado-Rodríguez's wife, Jacqueline Santana ("Santana"). *Ríos-Orama Test.* June 26, 2023; *Delgado-Rodríguez Test.* June 26, 2023. After this situation got out of hand, Delgado-Rodríguez fired Ríos-Orama and gave him one week to move out. *Id.* He heard nothing about the situation until neighbors called approximately three weeks later saying that Ríos-Orama had been arrested. *Id.* After hearing this, Delgado-Rodríguez asked Santana to clean the property so the couple could rent it to someone new. *Id.* While doing so, Santana found someone else's personal items and called Delgado-Rodríguez. *Id.* He told her to leave the items in the apartment and call police because he thought the items might be related to the case against Ríos-Orama. *Id.*

Though Ríos-Orama agrees he was allowed to live rent-free in the apartment while repairing it, he disputes nearly all of Delgado-Rodríguez's remaining testimony. He testified he had the one and only set of keys to the property, which he retained until the day of his arrest. *Ríos-Orama Test.* June 26, 2023. He said Delgado-Rodríguez stored nothing at the property and almost never visited. *Id.* He said paint and other construction materials found at the apartment were for a

project he was working on in Caguas and his work repairing the apartment. *Id.*; Dkt. 76-1 at 27. He says he asked his girlfriend to move out without input from Delgado-Rodríguez. *Ríos-Orama Test.* June 26, 2023. And he says Delgado-Rodríguez asked his permission before allowing his other employee to move into the apartment. *Id.* Lastly, he agrees that Delgado-Rodríguez accused him of stealing tools, that he disputed this allegation with Santana, and that Delgado-Rodríguez subsequently fired him. *Id.* However, he says neither Delgado-Rodríguez nor Santana asked him to move out. *Id.*

### *The Search*

On March 28, 2022, Agent Cortés received a call from the San Lorenzo police station stating that a woman named Jacqueline Santana had found items belonging to Díaz-Trinidad at the former's property in San Lorenzo. *Cortés Test.* June 16, 2023. Police told Santana to leave everything in place and Agent Cortés drove to Santana's property. *Id.* When he arrived, he and another officer introduced themselves to Santana, got her information, and asked if she owned the residence. *Id.* She replied that she did along with her husband, Delgado-Rodríguez. *Id.* Agent Cortés noted that Santana had keys to the apartment, there were no signs of forced entry, and two young women who lived upstairs stated that Santana owned the property. *Id.* When asked what she had found in the apartment, Santana responded that there was a purse containing Díaz-Trinidad's Florida driver's license. *Id.* Santana said she found the purse while removing things from the house because she was cleaning the property so it could be rented to someone else. *Id.* She said Ríos-Orama had worked with her husband but was fired after he stole tools and disrespected Santana. *Id.* She further said she and her husband had thrown him out of the residence several weeks ago and had control over the property. *Id.* At this point, Agent Cortés asked Santana for consent to search the apartment which Santana provided. *Id.*; Dkt. 76-1 at 18–19.

Once inside, Agent Cortés saw a small brown wallet on the kitchen counter to his left and a black box containing colorful flowers straight in front of him. *Cortés Test.* June 16, 2023; Dkt. 76-1 at 25–27. After finding Díaz-Trinidad's Florida driver's license inside the wallet, he seized it and the box of flowers. *Cortés Test.* June 16, 2023. When he approached the box of flowers, he also noted a red wallet and pink backpack on top of a mattress in the same room though it is unclear whether he seized these items as well. *Id.*; Dkt. 76-1 at 28. While there were household items throughout the apartment, Agent Cortés did not ask to whom they belonged and Santana did not offer this information. *Cortés Test.* June 16, 2023; Dkt. 76-1 at 25–27. Agent Cortés noted documents, including one from the department of corrections, bearing Ríos-Orama's name but he could not recall any other information he saw in those papers. *Cortés Test.* June 16, 2023.

### The Lineup

On April 7, 2022, PRPD Agents Cortés and Zayas-Roldan, along with another agent, brought Ríos-Orama to the Caguas police station for a lineup. *Id.*; *Zayas-Roldan Test.* June 30, 2023. The agents parked in the adjacent parking structure, walked Ríos-Orama through a restricted area, and took him inside the station's back entrance, which is likewise restricted to officers, other police employees, and detainees. Dkt. 76-1 at 38; *Cortés Test.* June 16, 2023; *Zayas-Roldan Test.* June 30, 2023. From there, they took Ríos-Orama to the station's fourth floor and told him he would be participating in a lineup. *Id.* Meanwhile, Díaz-Trinidad entered the police station through the front entrance open to the public and was taken to the homicide division's waiting area on the third floor. *Cortés Test.* June 16, 2023; *Zayas-Roldan Test.* June 26, 2023. Agents gave Ríos-Orama a form explaining his *Miranda* rights, read him those rights, and Ríos-Orama invoked them. *Cortés Test.* June 16, 2023; Dkt. 77-1 at 1–2. Agent Cortés testified Ríos-Orama then said he had no attorney and waived his right to have counsel present at the lineup. *Cortés Test.* June 16, 2023;

Dkt. 76-1 at 39–40. Though the right-to-counsel waiver for the lineup has space for two witnesses to sign, only one did so and Agent Cortés testified that only one was required. *Id.* The time next to Ríos-Orama's signatures on both forms reads 11:15 a.m. Dkt. 76-1 at 39–40; Dkt. 77-1 at 1–2.

Agent Cortés reached out to the PRPD motorcycle division in Caguas to find lineup participants. *Cortés Test.* June 16, 2023. Though police sometimes use members of the public in lineups, Agent Cortés said none wanted to participate due to Puerto Rico's ongoing Covid-19 outbreak. *Id.* After finding motorcycle unit officers who had not previously interacted with Díaz-Trinidad and who he believed appeared sufficiently like Ríos-Orama, Agent Cortés brought them to a restricted access room and gave them black gowns, green hats, and Covid-19 facemasks. *Id.* These participants stood between five-feet-five and five-feet-nine inches tall and weighed between 185 and 220 pounds. *Rivera-Rosa Test.* June 26, 2023, *Baez-Vazquez Test.* June 26, 2023, *Campos-De Alba Test.* June 26, 2023, *Rivera-Rivera Test.* June 26, 2023. All had short hair or shaved heads. *Id.* Ríos-Orama measures six-foot-one, weighed about 150 pounds at the time of the lineup, and has long hair that he said did not fit in the hat participants wore. *Ríos-Orama Test.* June 26, 2023.

After finding participants, Agent Cortés says he then went to the fourth floor to retrieve Ríos-Orama. *Id.* However, Agent Zayas-Roldan said Agent Cortés called him from the first floor, where he remained, and Agent Zayas-Roldan and the other agent escorted Ríos-Orama to the first floor. *Zayas-Roldan Test.* June 30, 2023. Both agents agree Ríos-Orama was brought from the fourth to the first floor, where agents escorted him through the restricted back area and into the lineup room. *Id.*; *Cortés Test.* June 16, 2023; Dkt. 76-1 at 37–38. There, they removed his hand and foot restraints and gave him the same black gown, green hat, and Covid-19 mask worn by the police officer participants. *Cortés Test.* June 16, 2023; *Zayas-Roldan Test.* June 30, 2023. Both

stated it is not possible that Díaz Trinidad would have viewed Ríos-Orama during this time because detainees and members of the public are kept in separate areas. *Id.*

Next, Agents Cortés and Zayas-Roldan said they brought Ríos-Orama to a table with placards displaying numbers from one to five, told him to pick a number, and Ríos-Orama selected number three. *Id.*; Dkt. 76-1 at 30–31. After he did so, the remaining numbers were distributed to the four police officer lineup participants. *Cortés Test.* June 16, 2023. Agent Cortés then arranged all five lineup participants in a row near a glass window while ensuring their hair was hidden under their hats and their hands and feet remained inside their gowns. *Id.* Dkt. 76-1 at 33–35. He then called Sergeant Daisy Trinidad who brought Díaz Trinidad to the first floor. *Cortés Test.* June 16, 2023. While she stood outside the lineup room, officers explained she would enter, look through glass, and tell them if her assailant was in the lineup. *Id.* She went in the room and identified lineup participant number three, Ríos-Orama, as her assailant within approximately 30 to 40 seconds. *Id.*

After the identification, Agent Cortés escorted Díaz-Trinidad out of the lineup room and instructed the participants to move their chairs to the wall behind them for a photo. *Id.* Dkt. 76-1 at 32, 36. In this picture, he acknowledged that participant four's fingers are outside of his gown, but said that this was not the case when Díaz Trinidad identified Ríos-Orama in the lineup. *Id.* at 32; *Cortés Test.* June 16, 2023. He said police took no other pictures of the lineup participants before this photo. *Id.*

Ríos-Orama recalled the lineup differently. He says he was brought from the parking structure through the back door of the Caguas police station and placed next to a podium. *Ríos-Orama Test.* June 26, 2023. At that time, he says his hands and feet were restrained and he wore a khaki prison uniform. *Id.* He said he waited in this area and was never taken to the fourth floor of the station. *Id.* While seated near the podium, he could see through an open doorway where a

blonde woman he understood to be the supervisor of the robbery division passed from left to right with a five-foot-tall woman between 50 and 60 years old who had shoulder length hair. *Id.* He exchanged glances with the latter woman and she and he both nodded at each other as a greeting. *Id.* Though he did not know her identity at the time, he now believes she was the carjacking victim based on the video he watched with his attorney. *Id.* Further, he says he never told agents he lacked an attorney and instead asked why his attorney was not present. *Ríos-Orama Test.* June 26, 2023. After the lineup, Ríos-Orama says a woman handed him the form that he signed waiving his right to counsel at the lineup. *Id.*; Dkt. 76-1 at 39–40. He says he was feeling dizzy from low blood pressure and low blood sugar at this time and that he signed the form because it was useless to try to exercise his rights after the lineup had concluded. *Ríos-Orama Test.* June 26, 2023.

### *Ríos-Orama's Attorney*

Ríos-Orama also disputes that he told agents he had no attorney. He testified that a few days before the lineup, on April 2nd or 3rd, he spoke with an attorney with the Legal Aid Society, which represents indigent defendants in Puerto Rico. *Ríos-Orama Test.* June 26, 2023. He said this person told him that another attorney with the organization, named Rachel, would represent him at his bail hearing for his Puerto Rico stolen-vehicle-possession charge. *Id.* He said he discussed the hearing with this woman the following day, but offered no records of the hearing. *Id.* His preliminary hearing conference in his Puerto Rico case was scheduled for April 5. Dkt. 76-1 at 16. Agent Cortés testified that defendants are asked whether they have counsel at those hearings and, if not, are referred to the Legal Aid Society. *Cortés Test.* June 16, 2023. Agent Cortés called the Legal Aid Society on April 6 asking whether they represented Ríos-Orama and a receptionist told him they did not. *Id.* On April 11, attorneys from the Legal Aid Society filed a motion with the

Puerto Rico court stating, "we will assume representation of Ríos-Orama." *Cortés Test.* June 16, 2023; Dkt. 76-1 at 41–44.

## DISCUSSION

Ríos-Orama challenges the victim's lineup identification of him arguing it violated his due process rights because it was unduly suggestive, he lacked counsel during the lineup, and PRPD agents failed to follow that agency's regulations during the proceeding. Dkt. 28 at 1. He also moved to suppress pictures of and evidence seized from the San Lorenzo residence arguing his landlord could not consent on his behalf and PRPD officers knew he lived there. Dkt. 36. The government disagrees on all points. Dkts. 42, 62. I address each contention below.

### I.     Identification

### A.  Due Process

Identification evidence should be suppressed as a matter of due process only in extraordinary cases. *United States v. Henderson*, 320 F.3d 92, 100 (1st Cir. 2003). To withhold such evidence from a jury, the defendant must persuade the court the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *Simmons v. United States*, 390 U.S. 377, 384 (1968). First, the defendant must establish that the identification procedure was unduly suggestive. *Perry v. New Hampshire*, 565 U.S. 228, 241-42 (2012). If it was not, the inquiry ends. *United States v. Melvin*, 730 F.3d 29, 34 (1st Cir. 2013).

If the defendant successfully establishes that the procedure was unduly suggestive, the court then "examine[s] the totality of the circumstances to ascertain whether the identification was nevertheless reliable." *Id.* (citing *United States v. DeCologero*, 530 F.3d 36, 62 (1st Cir. 2008)). "[I]f the indicia of reliability are strong enough to outweigh the corrupting effect of the police-

arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." *Perry*, 565 U.S. at 232.

Ríos-Orama argues his lineup was unduly suggestive because PRPD agents allowed Díaz-Trinidad to see him prior to her identification, the other participants were physically unlike him, police had lineup participants wear a facemask and baseball cap though Díaz-Trinidad never said her assailant wore either article of clothing, and one of the participants pointed at Ríos-Orama during the lineup. Dkt. 28 at 12–13. I recommend finding none of these concerns warrant suppressing Díaz-Trinidad's identification. Moreover, in the unlikely event she saw Ríos-Orama at the police station before the lineup, her identification was nevertheless reliable.

### 1.  Suggestiveness

### *Viewing prior to lineup*

Ríos-Orama argues the victim saw him handcuffed and wearing a state prison uniform before the lineup at the Caguas police station. Dkt. 28 at 12–13. He explained that officers placed him next to a podium in the lineup room and he could see through a doorway from where he was seated. *Ríos-Orama Test.* June 26, 2023; *see* Dkt. 77-1 at 22–23. At this time, he said he was wearing a khaki prison uniform, had blue boxes restraining his hands, and had his feet shackled. *Ríos-Orama Test.* June 26, 2023. At one point, a woman he believed was the supervisor of the PRPD's robbery division in Caguas passed from left to right through the doorway with a thin woman who was approximately five feet tall, had shoulder-length hair, and was between 50 and 60 years old. *Ríos-Orama Test.* June 26, 2023; *see* Dkt. 77-1 at 23. He said he exchanged a glance with the latter woman and both he and she nodded as a greeting. *Ríos-Orama Test.* June 26, 2023. Though he did not know her identity at the time, he believes she was the victim of the carjacking based on a video of the incident he watched with his attorney. *Id.*

PRPD Agents Cortés and Zayas-Roldan both contradicted this version of events. Agent Cortés testified that the victim entered the police station through the front entrance while Ríos-Orama entered through the back. *Cortés Test.* June 16, 2023. He stated Díaz-Trinidad was taken to the homicide division's waiting area on the third floor of the police station while Ríos Orama was placed on the fourth floor in a secure area inaccessible to the public. *Id.* Then, he says he brought Ríos-Orama to the first floor where his hand and foot restraints were removed and he was given a lineup uniform like the participating officers. *Id.* Next, Ríos-Orama chose a number, had his picture taken, and Agent Cortés then arranged the lineup participants so their hair was hidden under their hats and their hands and feet remained inside their gowns. *Id.*; *see* Dkt. 76-1 at 30–31. After this, a police sergeant brought Díaz-Trinidad to the area of the identification room separated from the lineup participants by a glass panel where she observed the participants and indicated that participant three, Ríos-Orama, committed the carjacking. *Id.*

Agent Zayas-Roldan essentially corroborated Agent Cortés's testimony. He said he, Agent Cortés, and a third agent brought Ríos-Orama to the Caguas police station through the back entrance and took him to a secure area on the fourth floor. *Zayas-Roldan Test.* June 30, 2023. Meanwhile, he believed Díaz-Trinidad was taken to the third floor. *Id.* Agent Cortés then went to the first floor to arrange the lineup while Agent Zayas-Roldan and the other agent stayed behind with Ríos-Orama. *Id.* After Agent Cortés called to say he was ready to do the lineup, Agent Zayas-Roldan and the other agent escorted Ríos-Orama to the first floor of the station in an elevator, left the police station through the restricted-access back area, and brought Ríos Orama back inside to the lineup room. *Id.* They took Ríos-Orama to a podium at the front of the room where Agent Cortés gave him documents and removed his handcuffs so he could sign them. *Id.* At this point, agents gave Ríos-Orama a hat and gown to match the officers participating in the lineup who were

already wearing the same attire. *Id.* Agents then gave matching facemasks to Ríos-Orama and the four officers participating in the lineup. *Id.* Ríos-Orama was told to select a number between one and five to wear during the lineup, and he chose the number three. *Id.* As for the area to the left of the doorway to the lineup room, from which the victim appeared per Ríos-Orama's testimony, Agent Zayas-Roldan testified it housed a storage room with no access to other areas. *Zayas-Roldan Test.* June 30, 2023; Dkt. 77-1 at 23. Accordingly, he said it was impossible to keep a witness waiting in that area. *Id.* When questioned about Ríos-Orama's contention that the victim passed the doorway into the lineup room from left to right, Agent Zayas-Roldan stated this was a complete lie. *Id.*

Accepting Ríos-Orama's story requires finding both Agent Cortés and Zayas-Roldan perjured themselves. I am not convinced that two officers who recited a nearly identical chain of events were both lying. I note that Agent Cortés said he brought Ríos-Orama from the fourth to the first floor of the station while Agent Zayas-Roldan testified that he and another agent brought Ríos-Orama to the first floor where Agent Cortés was waiting. Even if this warranted accepting Ríos-Orama's testimony on this issue, I still recommend finding the victim's identification reliable for the reasons discussed below.

### *Lineup participants and their attire*

Ríos-Orama next argues the other officers in the lineup look physically unlike him. Dkt. 28 at 14. "Authorities conducting lineups are required only to make reasonable efforts under the circumstances to conduct a fair and balanced presentation. They are not required to search for identical twins in age, height, weight, or facial features." *United States v. Traeger*, 289 F.3d 461, 474 (7th Cir. 2002).

While Ríos-Orama argues the lineup participants were all much larger than him, the *Traeger* court explored a defendant's contention that participants were much smaller. *Id.* Because the defendant there measured six-and-a-half feet tall and weighed around 350 pounds, the court there observed officers would have struggled to find lineup participants approximating his size and appearance. *Id.* Likewise here, Ríos-Orama testified that he is six-foot-one and weighed about 150 pounds. *Ríos-Orama Test.* June 26, 2023. He further said he looked physically destroyed during the lineup because he was skinny, had calluses on his hands, lacerations from drug use, had not showered, and his face was peeling from the sun. *Id.* On the contrary, the other four lineup participants measured between 5'5" and 5'9" inches tall and weighed between 185 and 220 pounds. *Rivera-Rosa Test.* June 26, 2023, *Báez-Vázquez Test.* June 26, 2023, *Campos-De Alba Test.* June 26, 2023, *Rivera-Rivera Test.* June 26, 2023. Thus, Ríos-Orama was both the tallest and thinnest lineup participant.

Agent Cortés testified police used officers from a motorcycle unit as lineup participants because members of the public did not want to participate in the lineup, held in April 2022, due to the Covid-19 health emergency. *Cortés Test.* June 16, 2023. However, PRPD agents mitigated differences between Ríos-Orama and the four motorcycle unit officers because all lineup participants were seated and wearing gowns. *See* Dkt. 76-1 at 32. While seated, Ríos-Orama did not appear noticeably taller than any of the other participants. *See id.* And while he may appear thinner, the gowns constituted a reasonable effort under the circumstances to obscure this difference and conduct a fair and balanced presentation. *See Traeger*, 289 F.3d at 474; *Ashby v. Senkowski*, 269 F. Supp. 2d 109, 117 (E.D.N.Y. 2003) (lineup not impermissibly suggestive where participants were seated and covered in sheets to obscure any differences in height and clothing).

Thus, the physical differences between Ríos-Orama and the other lineup participants do not warrant suppressing the victim's identification.

Ríos-Orama also argues police dressed lineup participants in hats and facemasks though the victim never stated her assailant wore either item. Dkt. 28 at 13–14. However, the government presented evidence the assailant wore both articles of clothing immediately before the attack. *See* Dkt. 76-1 at 1–2; Gov. Ex. 1 at 7:06; *Agent Cortés Test.* June 16, 2023. Accordingly, this argument does not warrant suppressing the victim's identification.

### *Officer pointing at Ríos-Orama*

Ríos-Orama also argues lineup participant four is pointing at him in the lineup photo. *See* Dkt. 28 at 5, 13. However, both Agent Cortés and Agent Zayas-Roldan testified this photo was taken after the victim identified Ríos-Orama and left the room. *Cortés Test.* June 16, 2023; *Zayas-Roldan Test.* June 30, 2023. Agent Cortés explained that during the lineup chairs are placed close to the glass. *Cortés Test.* June 16, 2023; Dkt. 76-1 at 33–35. He said after the lineup he took the victim out of the room and the participants were instructed to move their chairs to the back wall so they could all fit in the frame for a photo. *Cortés Test.* June 16, 2023; Dkt. 76-1 at 32, 36. Agent Cortés further testified he ensured all lineup participants had their hands covered during the procedure. *Cortés Test.* June 16, 2023. Ríos-Orama did not dispute this account of events in his testimony. Thus, I find the photo was taken after the victim identified Ríos-Orama. Accordingly, though participant four's fingers were uncovered in the lineup photo, this did not taint the identification.

### 2.  Reliability

I next examine whether Díaz-Trinidad's identification of Ríos-Orama was reliable even assuming she saw him at the police station prior to the lineup. An unduly suggestive identification

need not be suppressed if it was nevertheless reliable. *United States v. Garcia-Alvarez*, 541 F.3d 8, 14 (1st Cir. 2008) (citing *United States v. de Jesus-Ríos*, 990 F.2d 672, 677 (1st Cir. 1993)). In gauging reliability, courts examine the following:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.

*Id.* Though the parties dispute the victim's ability to view her assailant during the carjacking, the remaining factors favor finding the identification was reliable. After explaining that a victim was assaulted, bound, gagged, and held at gunpoint during a robbery and carjacking, the *Garcia-Alvarez* court found the lineup there was reliable because it assumed the victim's degree of attention during such an incident would have been high. *Id.* I assume the same is true here. As for the accuracy of her prior description, the victim here described her assailant the day after the carjacking as a tall, dark-skinned, thin person who wore a black shirt and an orange and yellow vest. *Cortés Test.* June 16, 2023. Though his shirt appears at least partly blue, the rest of this description is supported by surveillance camera screenshots and Ríos-Orama's testimony regarding his appearance. *See* 76-1 at 1–2; *Ríos-Orama Test.* June 26, 2023. Though the victim did not testify at the suppression hearing, Agent Zayas-Roldan said she identified Ríos-Orama in the lineup after less than a minute. *Zayas-Roldan Test.* June 30, 2023; *see Williams v. Bauman*, 759 F.3d 630, 639 (6th Cir. 2014) (identification reliable partly because witness identified defendant's face "within seconds"). And the police held the lineup approximately two weeks after the carjacking. *Agent Cortés Test.* June 16, 2023; Dkt. 76-1 at 40; *see United States v. Casey*, 825 F.3d 1, 18 (1st Cir. 2016) (finding photo array identification reliable because it was held five weeks after witness saw defendant).

Even discarding the witness's speedy identification of Ríos-Orama as the product of seeing him handcuffed before the lineup, the victim's identification was still reliable because she arguably had an opportunity to view her attacker during the crime, presumably paid a high degree of attention during the carjacking, accurately described her assailant the next day, and identified Ríos-Orama in the lineup relatively soon after the events occurred. Courts "are not required to accord each factor equal weight or even to consider all five factors." *Garcia-Alvarez*, 541 F.3d at 15. Even if just two or three of the factors support reliability, courts are generally unwilling to usurp the jury's role in evaluating witness identification evidence. *See Garcia-Alvarez*, 541 F.3d at 14–15; *United States v. Guzman-Rivera*, 990 F.2d 681, 683 (1st Cir. 1993). Accordingly, in the unlikely event that Ríos-Orama exchanged glances with the victim prior to the lineup, her identification of him was nevertheless reliable.

## B.  Right to Counsel

Ríos-Orama also argues PRPD agents violated his Sixth Amendment right to counsel by conducting the lineup without coordinating with, or at least notifying, his attorney. Dkt. 28 at 12–13. The government contends his right to counsel had not yet attached because the right is offense-specific and that, even if it had, Ríos-Orama, waived that right. Dkt. 42 at 3–4, 8. He responds that his waiver was invalid because the government did not inform him of his right, and the consequences of waiver, in "clear and unequivocal" terms. Dkt. 47 at 7. I address those arguments below.

## 1.  Whether the Right to Counsel Attached

The right to counsel "attaches only upon the initiation of adversary judicial criminal proceedings against the defendant, and thereafter the right applies to all critical stages of the prosecution, before, during and after trial." *United States v. Bartelho*, 129 F.3d 663, 674 (1st Cir.

1997) (quoting *Roberts v. State of Me.*, 48 F.3d 1287, 1290 (1st Cir. 1995)). Initiation occurs "by way of formal charge, preliminary hearing, indictment, information, or arraignment." *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991) (citing *United States v. Gouveia*, 467 U.S. 180, 188 (1984)). "The right to counsel is offense specific, however, so an accused charged with one crime cannot invoke a right to counsel with respect to other uncharged crimes." *Bartelho*, 129 F.3d at 674 (citing *McNeil*, 501 U.S. at 175 (1991)) (further citations omitted).

At the time of the identification, Ríos-Orama had not been charged with the carjacking offense he faces in this case. However, he notes he had been charged with possession of a stolen vehicle in Puerto Rico court for the same Nissan Pathfinder at issue here. Dkt. 47 at 6. This, he argues, renders his case distinguishable from *Bartelho* because the possession and carjacking charges covered the same series of events. *Id.* However, the Sixth Amendment right to counsel does not extend to crimes that are factually related to those that have been charged. *Texas v. Cobb*, 532 U.S. 162, 168 (2001). Instead, it covers offenses that, even if not formally charged, would be considered the same under the test outlined in *Blockburger v. United States*, 284 U.S. 299 (1932). *See Cobb*, 532 U.S. at 173.

The government argues Ríos-Orama waived his *Blockburger* argument because he did not argue the possession and carjacking offenses were the same offense under that test. Dkt. 53 at 4 (citing *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)). However, Ríos-Orama raised the issue that his stolen vehicle possession charge entitled him to counsel at the lineup regarding the alleged carjacking. Dkt. 28 at 12; Dkt. 47 at 5–9. Though he argued the inappropriate standard, his lengthy discussion went far beyond "mention[ing] a possible argument in the most skeletal way." *Zannino*, 895 F.2d at 17. Accordingly, I will determine whether Ríos-Orama was entitled to counsel under the *Blockburger* test.

That test examines, "whether each [criminal statute] requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304. "For two statutes to criminalize the same offense, the conduct described in one offense must <u>necessarily</u> include the conduct of the second offense." *United States* v. *Almonte-Nuñez*, 963 F.3d 58, 70 (1st Cir. 2020) (emphasis in original) (quotation and alteration omitted). Though the federal government and states may prosecute the same conduct because they are separate sovereigns, the same is not true for Puerto Rico. *Puerto Rico v. Sanchez Valle*, 579 U.S. 59, 78 (2016).

The federal carjacking statute with which Ríos-Orama is charged requires that he "with the intent to cause death or serious bodily harm [took] a motor vehicle that ha[d] been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempt[ed] to do so." 18 U.S.C. § 2119(1). The Puerto Rico possession statute states "[a]ny person who owns, buys, receives, stores, hides, transports, retains or disposes through sale, exchange or otherwise a motor vehicle or parts of a motor vehicle knowing that it was obtained through illegal appropriation, theft, extortion or any other illegal means shall incur in a third degree felony." 9 L.P.R.A. § 3214.

A state's courts have the final authority to interpret that state's legislation. *Brown v. Ohio*, 432 U.S. 161, 167 (1977). Though not a state, the same is true for Puerto Rico. *Corporación Insular de Seguros v. García*, 680 F. Supp. 476, 482 (D.P.R. 1988) (citing *Díaz v. González*, 261 U.S. 102, 105–106 (1923); *Bonet v. Texas Co. of Puerto Rico, Inc.*, 308 U.S. 463, 470–471 (1940)). However, I have not found any Puerto Rico court that has addressed whether the Commonwealth's stolen-vehicle-possession law, 9 L.P.R.A. § 3214, is a lesser included offense of the federal carjacking statute, 18 U.S.C. § 2119.

The government analogizes to a Supreme Court case that found receipt or possession of the proceeds of a bank robbery, in violation of 18 U.S.C. § 2113(c), "'is simply not a lesser included offense' of the bank robbery." Dkt. 53 at 5 (citing *United States v. Gaddis*, 424 U.S. 544, 548 (1976)). *Gaddis* affirmed an appeals court decision that "a person convicted of robbing a bank in violation of 18 U.S.C. §§ 2113(a), (b), and (d), cannot also be convicted of receiving or possessing the proceeds of that robbery in violation of 18 U.S.C. § 2113(c)." *Gaddis*, 424 U.S. at 547. This is because, in enacting § 2113(c), "Congress was trying to reach a new group of wrongdoers, not to multiply the offense of the bank robbers themselves." *Id.* Thus, while a robber could not be convicted of possessing stolen proceeds he was also convicted of stealing, the possession of robbery proceeds is not a lesser included offense of a robbery because the former targets "a different 'group of wrongdoers,' i.e., 'those who receive the loot from the robber.'" *Id.* at 548.

The same is true here. 18 U.S.C. § 2119(1) requires (1) taking a vehicle (2) transported, shipped, or received in interstate or foreign commerce; (3) from another person; (4) by force and violence, intimidation, or a threat; (5) with an intent to cause death or serious bodily harm. 9 L.P.R.A. § 3214 requires none of these elements. Similarly, 9 L.P.R.A. § 3214 requires that a person (1) "owns, buys, receives, stores, hides, transports, retains or disposes through sale, exchange or otherwise" a motor vehicle or its parts; (2) knowing the vehicle or its parts had been acquired illegally. A conviction under 18 U.S.C. § 2119(1) does not require this conduct. Like the possession statute at issue in *Gaddis*, Puerto Rico's stolen-vehicle-possession statute targets not carjackers, but "a different 'group of wrongdoers,'" i.e., those who acquire, possess, or dispose of vehicles or parts knowing they were obtained unlawfully. *See* 424 U.S. at 548. Accordingly, "each [criminal statute] requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304.

Because the federal carjacking statute and Puerto Rico's stolen-vehicle-possession statute are not equivalent under the *Blockburger* test, Ríos-Orama's right to counsel had not yet attached as of the lineup.

### 2. Waiver

Ríos-Orama argues he twice refused to waive his right to counsel and that an attempt to obtain a waiver at the lineup is doomed to fail. Dkt. 28 at 12 (citing *United States v. Wade*, 388 U.S. 218, 237 (1967)). Further, he contends the government excluded his counsel from participating in the lineup by failing to notify them of its occurrence. *Id.* The government argues Ríos-Orama told police he lacked an attorney and they had no reason to doubt him. Dkt. 42 at 8. Further it says he declined the offer of free counsel at the lineup in writing. *Id.* Ríos-Orama disputes he was advised of his right to counsel. Dkt. 47 at 7. Further he argues PRPD agents had him sign a consent to proceed with the lineup though he had just signed another form invoking his *Miranda* rights. *Id.*

There can be an "intelligent waiver" of the right to counsel. *Wade*, 388 U.S. at 237. However, the government must prove "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). This is true at critical stages of the proceedings, such as a lineup. *Brewer v. Williams*, 430 U.S. 387, 404 (1977) (citing *Wade*, 388 U.S at 237). Further, "'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and . . . 'do not presume acquiescence in the loss of fundamental rights.'" *Zerbst*, 304 U.S. at 464 (citation omitted).

When examining a purported *Miranda* waiver, the Supreme Court observed, "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to

establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). In another *Miranda* decision, the Court held, to be knowing, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). Otherwise, an out-of-court identification conducted without counsel after the right attached must be excluded. *Wade*, 388 U.S. at 224, 236-37.

### *Multiple waiver forms*

Ríos-Orama correctly notes that the government presented documentation showing he both waived his right to counsel at the lineup and refused to waive his right to counsel after receiving *Miranda* warnings on the same day at the same time. *Compare* Dkt. 77-1 at 1–2 *with* Dkt. 76-1 at 39–40. However, these are separate rights that protect separate interests. *McNeil*, 501 U.S. at 177–78 ("To invoke the Sixth Amendment interest is, as a matter of fact, not to invoke the *Miranda–Edwards* interest. One might be quite willing to speak to the police without counsel present concerning many matters, but not the matter under prosecution."). Similarly, Ríos-Orama may have been unwilling to answer questions without counsel but still willing to participate in a lineup. According to documents he signed, that was precisely the case.

Ríos-Orama argues that asking him whether he agreed to waive his right to counsel at the lineup after he had just signed a form asserting his *Miranda* right to counsel is "inherently confusing." Dkt. 47 at 6. That may be so, but he cites no authority finding this practice prevented

him from providing the "intelligent waiver" contemplated by *Wade*. On the other hand, at least one circuit has held that, after a *Miranda* warning, "a separate and different warning was required with reference to the lineups." *United States v. Ayers*, 426 F.2d 524, 527 (2d Cir. 1970). Another circuit has observed that a *Miranda* waiver executed the day of a lineup "does not necessarily establish a waiver of the right to counsel's presence at the lineup," *United States v. Thomas*, 536 F.2d 1253, 1254 (8th Cir. 1976). Such a finding implicitly requires presenting suspects with both *Miranda* waivers and Sixth-Amendment waivers. Accordingly, the presentation of multiple waiver forms did not prevent Ríos-Orama from providing an intelligent waiver.

### *Advisal of right*

Ríos-Orama also denies being advised of his right to counsel when given the waiver. Dkt. 47 at 7. However, above his signature the form reads "SUSPECT'S WAIVER OF RIGHT TO LEGAL ASSISTANCE: I certify that I have been advised of my right and/or offer of free legal assistance in this Line-Up procedure, which I waive voluntarily and intelligently." Dkt. 76-1 at 40. The document was provided to Ríos-Orama in Spanish, which he can read and write. *Id.* at 39; *Ríos-Orama Test.* June 30, 2023. He further testified that he read it before signing. *Id.* Accordingly, I find Ríos-Orama's testimony lacks credibility to the extent he contends he was not advised of his right to counsel.

I note that Ríos-Orama testified he was given the *Miranda* waiver prior to the lineup and the document waiving his right to counsel at the lineup after it was over. *Ríos-Orama Test.* June 26, 2023. This too seems doubtful. Agent Cortés testified he gave Ríos-Orama the document waiving counsel at the lineup before it occurred and Ríos-Orama signed it at that time. *Agent Cortés Test.* June 16, 2023. Further, Ríos-Orama wrote the same time next to his signature on both his *Miranda* waiver and lineup waiver. *Compare* Dkt. 77-1 at 1–2 *with* Dkt. 76-1 at 39–40. The

lineup waiver says he signed at 11:15 a.m. and that the lineup occurred at 11:34 p.m., although it presumably means 11:34 a.m. *Id.* Moreover, Ríos-Orama previously informed this court he "was told he had to sign the document [waiving counsel at the lineup] as a consent to proceed with the line-up procedure . . . ." Dkt. 47 at 7. Accordingly, his new testimony that he was given this document after the lineup is likewise not credible.

### *Attorney notification*

Ríos-Orama next argues PRPD agents either knew or should have known he already had an attorney at the Legal Aid Society, which represents indigent criminal defendants in Puerto Rico courts, for his Puerto Rico stolen-vehicle-possession case. Dkt. 47 at 7–8. He said PRPD agents took him to an arrest hearing on March 25th, at which a preliminary hearing was set for April 5th, and PRPD agents are aware that counsel is appointed at preliminary hearings. *Id.* at 8. Thus, he argues PRPD agents were on notice that he was represented by counsel by the April 7th lineup. *Id.* Ríos-Orama also contends he spoke with a Legal Aid Society attorney on April 2nd or 3rd and was told his attorney was named Rachel. *Ríos-Orama Test.* June 30, 2023. And he says he asked agents why his attorney was not present at the lineup. *Rios-Orama Test.* June 26, 2023. Accordingly, he argues, PRPD officials were required to notify his attorney before conducting a lineup. Dkt. 47 at 8.

The government highlights a record of Ríos-Orama's initial appearance in Puerto Rico court showing he attended the hearing without an attorney. Dkt. 42 at 8; Dkt. 76-1 at 16. The document also shows the court set a preliminary hearing conference for April 5th. *Id.* However, Agent Cortés testified attorneys are not appointed at these conferences and that Ríos-Orama told him before the lineup on April 7th that he did not have an attorney. *Cortés Test.* June 16, 2023. Though Ríos-Orama denies this and says he asked why his attorney was not at the lineup, this

seems doubtful because he waived his right to have an attorney present as discussed above. Even if it were true, Agent Cortés also said he called the Legal Aid Society on April 6th and a receptionist there told him they had not assumed representation of Ríos-Orama. *Id.* No documentation of the Legal Aid Society's representation exists until April 11, when its attorneys told a Puerto Rico court "we will assume legal representation of [Ríos-Orama]." Dkt. 76-1 at 43. Accordingly, even if Ríos-Orama had a right to counsel at the lineup, I recommend finding he waived that right. I further recommend finding he did not have an attorney as of the lineup, and PRPD officers had no reason to think he did.

### C.  PRPD Regulations

Ríos-Orama also argues that PRPD agents violated that agency's General Order on Identifications due to all the purported shortcomings discussed above. Dkt. 28 at 12–14. Assuming that is true, none of those transgressions amount to a constitutional violation requiring suppressing the victim's identification for the reasons already discussed. Ríos-Orama additionally argues PRPD agents violated the General Order because it requires two witnesses sign a defendant's waiver of his right to an attorney and that participants be dressed in white, as opposed to black, coverings. *Id.* at 14–15. Only one witness signed Ríos-Orama's waiver of his right to counsel at the lineup. Dkt. 42-2. However, Ríos-Orama admits he signed this waiver. *Ríos-Orama Test.* June 26, 2023. For reasons already discussed, his testimony that he only signed it after the lineup is unconvincing. Given that, I recommend finding any failure to obtain a second witness does not require suppressing the victim's identification. Further, Ríos-Orama does not explain how dressing lineup participants in black instead of white coverings taints the identification and I fail to see how it would. Thus, I recommend finding the purported violations of the General Order do not require suppressing the victim's identification.

Accordingly, I recommend Ríos-Orama's motion to suppress the victim's lineup identification of him be **DENIED**.

## II.      Evidence Seized from Residence

Ríos-Orama also moved to suppress pictures taken of and evidence seized from a residence in San Lorenzo, Puerto Rico. Dkt. 36. He argues he had a reasonable expectation of privacy in the basement apartment of the building, his landlord never had authority to consent to a search, and no exigent circumstances justified an exception to the warrant requirement. *Id.* at 7. The government contends Ríos-Orama lacked an expectation of privacy in the residence because he had been evicted and PRPD agents properly obtained consent to search from Ríos-Orama's former landlord who had both actual and apparent authority over the residence. Dkt. 62. I recommend finding Ríos-Orama's landlord at least had apparent authority to consent to a search and did so.

### A.  Reasonable Expectation of Privacy

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "[C]apacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Minnesota v. Carter*, 525 U.S. 83, 88 (1988) (quoting *Rakas v. Illinois*, 439 U.S. 128, 144 (1978)) (internal quotation omitted). Thus, to challenge a search or seizure a defendant must demonstrate "an actual, subjective, expectation of privacy . . . that society is prepared to recognize as objectively reasonable." *United States v. Battle*, 637 F.3d 44, 48–49 (1st Cir. 2011) (internal quotations omitted); *see United States v. Rodriguez-Ramos*, 704 F.2d 17, 21 (1st Cir. 1983) (finding defendant "bears the burden of showing that he had an expectation of privacy in the travel bag and thus standing to challenge the legality of its search").

Ríos-Orama initially argued he lived in the San Lorenzo residence from September 2021 until the day of his arrest and that, though his landlord claimed he had failed to pay rent, no eviction proceedings had begun. Dkt. 36 at 2–3. The government responded that he failed to provide a statement with his motion supporting his claim to a reasonable expectation of privacy. Dkt. 62 at 4. Further, it argued he provided no proof for his assertion that he lived in the apartment until the day of his arrest and failed to explain the details of his alleged lease. *Id.*

I begin with Ríos-Orama's subjective expectation of privacy. He testified that he lived in the apartment beginning in May 2021, when he began working for its owner, Efraín Delgado-Rodríguez, and that he would remodel the premises as payment. *Ríos-Orama Test.* June 26, 2023. After Delgado-Rodríguez asked Ríos-Orama to work seven days a week, Ríos-Orama stopped repairing the apartment because he did not have the time. *Id.* He said Delgado-Rodríguez never entered the apartment without his permission, but at one point asked Ríos-Orama if two coworkers could live in the apartment as well and Ríos-Orama agreed. *Id.* He further testified that, as of his arrest, he did not owe money to either Delgado-Rodríguez or his then-wife Jacqueline Santana and neither had asked him to leave the property. *Id.* Additionally, Ríos-Orama said he had the only set of keys to both a black gate leading to the premises and the apartment's front door. *Id.*; *see also* Dkt. 76-1 at 20, 23–24. He said he would keep both doors closed and locked because the area was dangerous and that he left the apartment in this state when he was arrested. *Ríos-Orama Test.* June 26, 2023; June 30, 2023.

Delgado-Rodríguez told a different story. He said he used the apartment for storage but allowed Ríos-Orama to live there while repairing it. *Delgado-Rodríguez Test.* June 26, 2023. He said he visited the apartment almost daily while Ríos-Orama lived there because he needed to retrieve materials stored there. *Id.* Upon arriving, Delgado-Rodríguez said he would enter the

apartment with his own keys and often without warning Ríos-Orama who would be sleeping inside. *Id.* Delgado-Rodríguez said he had another employee move into the apartment for a couple months because that person had nowhere else to live. *Id.* After a few months, he fired and evicted that employee for stealing tools from his company. *Id.* In either late February or early March 2022, Ríos-Orama was fired and evicted for the same reason. *Id.* Delgado-Rodríguez testified he gave Ríos-Orama a week to leave the apartment and Ríos-Orama never refused to leave the premises. *Id.* He said he heard nothing until three weeks later when a female neighbor of the residence called reporting that Ríos-Orama had been arrested. *Id.* Delgado-Rodríguez sent his then-wife Jacqueline Santana to the property and she called him to say someone else's personal items were inside the apartment. *Id.* At that point, Delgado-Rodríguez told her to leave the apartment as it was and call police. *Id.* He further said he instructed her to let police enter the premises. *Id.*

There are several discrepancies between Ríos-Orama's and Delgado-Rodríguez's two stories. I turn first to the apartment keys. If Ríos-Orama had the only set of keys as he claims, it is unclear how Jacqueline Santana entered the apartment, discovered the items belonging to someone else, and let police on the premises. While she presumably could have broken the locks, Agent Cortés testified Santana had keys to the apartment and there were no signs of forced entry. *Cortés Test.* June 16, 2023. As there is no evidence that Ríos-Orama returned his set of keys to either Delgado-Rodríguez or Santana, and there is strong evidence that Santana used keys to enter the apartment and let PRPD agents inside, I inescapably conclude that Delgado-Rodríguez and Santana had at least one additional set of keys to the apartment between them. However, I note that a tenant does not lose his reasonable expectation of privacy simply because his landlord has a spare set of keys. *See United States v. Warner*, 843 F.2d 401, 403 (9th Cir. 1988) (landlord who used key to open rented garage for officers could not give them lawful consent to search premises);

*see also United States v. Salimonu*, 182 F.3d 63, 70 (1st Cir. 1999) (quoting in parenthetical *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974) ("common authority" over property such that parties may consent to a search rests on "*mutual use* of the property by persons generally having joint access or control for most purposes")) (emphasis in *Salimonu*).

Second, it is unclear Ríos-Orama ever stopped living in the San Lorenzo apartment. The government's photos show his personal items scattered throughout the kitchen and a bedroom. *Ríos-Orama Test.* June 26, 2023; Dkt. 76-1 at 25–27, 29. Further, the government's theory that Ríos-Orama stashed items from the victim's stolen vehicle in the apartment necessarily requires that Ríos-Orama visited the premises sometime after the carjacking on March 22, 2022, nearly a month after Delgado-Rodríguez purportedly told him to leave the apartment. The government highlights that Ríos-Orama apparently told PRPD agents he was homeless when they arrested him, *Agent Cortés Test.* June 16, 2023; Dkt. 76-1 at 10, which Ríos-Orama vigorously disputes. *Ríos-Orama Test.* June 26, 2023. However, multiple circuit courts have found a defendant can have an expectation of privacy in a residence even after denying he lives there. *United States v. Ellis*, 499 F.3d 686 (7th Cir. 2007) (defendant had expectation of privacy notwithstanding fact he denied living in the home when speaking to officers); *United States v. Vega*, 221 F.3d 789, 797 (5th Cir. 2000) ("One does not lose the legitimate expectation of privacy in a residence merely by denying an interest therein.") (abrogated on other grounds); *United States v. Morales*, 737 F.2d 761, 764 (8th Cir. 1984) (defendant's disclaimer to police that a certain hotel key was his did not constitute an abandonment of the room so as to deprive him of standing). The *Morales* court found it particularly problematic that the government sought to use a defendant's alleged disclaimer of ownership in a hotel key to support a warrantless entry during a suppression hearing and then argue

at trial that the defendant's possession of a key supported finding constructive possession of drugs found in a hotel room. *Id.*

The government's theory here is similarly problematic. It argues Ríos-Orama said he was homeless when he was arrested two days after the carjacking, but nevertheless believes that items found within the San Lorenzo apartment are evidence of Ríos-Orama's guilt. *See also United States v. Issacs*, 708 F.2d 1365, 1368 (9th Cir. 1983) (finding government cannot rely on defendant's denial he owned incriminating journal to defeat his ability to contest warrantless search at the same time it introduces the journal as evidence of his guilt). Based on evidence that Ríos-Orama's personal items remained scattered throughout the apartment, his testimony that he lived there and retained a set of keys at the time of his arrest, and the government's apparent belief he spent time there between March 22nd and his arrest on March 24th, I recommend finding Ríos-Orama held a subjective expectation of privacy in the San Lorenzo apartment when he was arrested.

I turn to whether Ríos-Orama's subjective expectation of privacy was reasonable. As outlined, he and Delgado-Rodríguez disagree over whether Ríos-Orama was asked to vacate the premises approximately three weeks before his arrest. They also contest whether Delgado-Rodríguez could enter without Ríos-Orama's permission even before Ríos-Orama's purported eviction. As mentioned, Delgado-Rodríguez is currently facing felony identity theft and bank fraud charges in an unrelated case but has not reached a plea agreement with prosecutors. *Delgado-Rodríguez Test.* June 26, 2023; Crim. No. 22-136 (SCC). Though he stated he was unaware of any effort by his lawyer to reach a plea agreement, his lawyer filed an informative motion in that case stating she and Delgado-Rodríguez had met with prosecutors to seek "some type of benefit" for his assistance in this case. *See* Crim. No. 22-136 (SCC), Dkt. 48. Further, I have already noted

*United States of America v. Héctor Ríos-Orama*, Crim. No. 22-174 (RAM/BJM)                                       32

various inconsistencies and implausible assertions in Ríos-Orama's testimony. Fortunately, I need

not pick between these two witnesses' stories because, even assuming Ríos-Orama's subjective

expectation of privacy was reasonable, PRPD agents nevertheless obtained consent to search the

San Lorenzo apartment from Santana, who had the apparent authority to provide it.

### B. Apparent Authority

A search is valid if, at the time, officers reasonably believed the person who consented to

it had the authority to do so, even if the person lacked that authority. *Illinois v. Rodriguez*, 497

U.S. 177, 185–86, 188–89 (1990); *United States v. Carrasco*, 540 F.3d 43, 49 (1st Cir. 2008). "The

touchstone of this inquiry is what was reasonable under the circumstances." *United States v.*

*Gonzalez*, 609 F.3d 13, 18 (1st Cir. 2010) (citing *Rodriguez*, 497 U.S. at 188–89). In this inquiry,

courts ask "would the facts available to the officer at the moment . . . warrant a man of reasonable

caution in the belief that the consenting party has authority over the premises?" *Id.* at 188 (quoting

*Terry v. Ohio*, 392 U.S. 1, 21–22 (1968)) (alteration in original) (internal quotation marks omitted).

As mentioned, Agent Cortés testified Ríos-Orama said he was homeless when he was

arrested and told paramedics this when they treated him the next morning. *Cortés Test.* June 16,

2023; Dkt. 76-1 at 10, 13. Ríos-Orama disputes this and says officers never asked where he lived.

*Ríos-Orama Test.* June 26, 2023. Instead, he says they mocked him asking why he was in San

Lorenzo, a section of Caguas approximately 45 minutes south of San Juan, if he was from Manatí,

a town approximately 45 minutes west of the city. *Id.* He says he responded by explaining he had

recently been released from jail in Ponce and the only available place to stay was at the Los

Peregrinos homeless shelter in Caguas. *Id.* He says he then explained that, while at Los Peregrinos,

he met Delgado-Rodríguez who hired him and invited him to live in the San Lorenzo apartment.

*Id.* Ríos-Orama maintains that he always gave PRPD agents this explanation when they asked about his living situation during their investigation. *Id.*

Again, I find Ríos-Orama's testimony hard to believe. First, as discussed, it is contradicted by Agent Cortés's testimony and contemporaneous documentation. Second, at the April 7 lineup, Ríos-Orama's address is again listed as homeless. Dkt. 76-1 at 40. Agent Cortés testified this was based on Ríos-Orama's statements that day. *Agent Cortés Test.* June 16, 2023. It strains belief that Agent Cortés would write that Ríos-Orama was homeless on April 7 if Ríos-Orama told him he lived at the residence where Agent Cortés found the victim's wallet on March 28. Such an admission would be critical, and presumably attention grabbing, evidence in Agent Cortés's carjacking investigation. Accordingly, I believe Agent Cortés's testimony that Ríos-Orama said he was homeless when he was arrested.

Turning to Agent Cortés's search of the San Lorenzo apartment, he testified that police in San Lorenzo informed him that Jacqueline Santana had found property belonging to the victim at her property in that neighborhood. *Agent Cortés Test.* June 16, 2023. He said he arrived with another officer, they introduced themselves, and asked Santana if she owned the property. She responded that she did along with her husband, Delgado-Rodríguez. *Id.* When Agent Cortés asked Santana what she had found, she said she had discovered a purse with Díaz-Trinidad's license inside. *Id.* She stated she found this while removing things from the property after she and her husband had evicted Ríos-Orama a few weeks prior. *Id.* She explained that she and her husband had fired and evicted Ríos-Orama after he stole tools from their company and disrespected her. *Id.* Agent Cortés noted that Santana had the keys to the San Lorenzo apartment and there were no signs of forced entry. *Id.* Santana then gave police written authorization to enter the apartment. *Id.*; Dkt. 76-1 at 19.

Though Ríos-Orama claims he lived in the apartment and was never asked to leave, he does not explain why Santana apparently felt she had the right to enter and clean the apartment to be rented to someone else. Though Santana did not testify, her cleaning of the apartment, call to police, and explanation of Ríos-Orama's eviction corroborates Delgado-Rodríguez's testimony. "While a landlord cannot ordinarily consent to a search of a tenant's home, . . . she can consent to a search of an unleased apartment." *United States v. Law*, 528 F.3d 888, 904 (D.C. Cir. 2008) (citing *Chapman v. United States*, 365 U.S. 610, 616–17 (1961); *United States v. Kelly*, 551 F.2d 760, 764 (8th Cir. 1977)).

*Law* shares several similarities with this case. There, a defendant argued his landlord told police the searched apartment was currently vacant but being used to store "some furniture and other matters." *Id.* And though the landlord also stated the defendant might have a set of keys, the *Law* court found agents reasonably relied on the landlord's authority to consent to a search because she said the apartment was currently vacant and "[i]t was reasonable for the agents to believe [the landlord] knew the occupancy status of one of only four apartment units in her building." *Id.* Accordingly, the *Law* court affirmed a district court's denial of the defendant's suppression motion without a hearing. *Id.* And though *Law* comes from outside this circuit, the First Circuit has cited it approvingly. *Gonzalez*, 609 F.3d at 19.

Like the landlord in *Law*, Santana told police the unit at issue here was vacant. *Cortés Test.* June 16, 2023. Though Ríos-Orama claimed he had keys, and the government's belief he accessed the apartment just days before the search supports that assertion, that fact does not undermine a landlord's claim an apartment is vacant even if it makes it "a closer case." *Law*, 528 F.3d at 904. Moreover, unlike in *Law*, there is no evidence Santana told PRPD agents that Ríos-Orama had a set of keys or that they had any reason to know he did. Further, Delgado-Rodríguez testified the

San Lorenzo residence is divided into the basement level, which Ríos-Orama rented, and the upper level, where other tenants lived. *Delgado-Rodríguez Test.* June 26, 2023; *see* Dkt. 76-1 at 20, 23. Though it is unclear whether the upper level is further subdivided, this house at least comparable to the four-unit building in *Law*. There, the court determined police could reasonably assume the landlord knew the occupancy status of each unit. *Law*, 528 F.3d at 904. The same is true here. Accordingly, like the landlord in *Law*, Santana had apparent authority to consent to search the San Lorenzo apartment. Upon entering, Agent Cortés could see the beige wallet and black box of flowers in plain view. *Cortés Test.* June 16, 2023; Dkt. 76-1 at 25–27. When he approached the flowers, he could see the red wallet and a pink backpack. *Cortés Test.* June 16, 2023; Dkt. 76-1 at 28. Accordingly, Ríos-Orama's motion to suppress photos of these items and the items themselves should be **DENIED**.

## CONCLUSION

For the foregoing reasons, I recommend that Ríos-Orama's motions to suppress be **DENIED.**

This report and recommendation is filed pursuant to 28 U.S.C. 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court within fourteen (14) days of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30-31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 31st day of July, 2023.

**S/** *Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge