**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | **CRIMINAL NO. 22-174 (RAM)** |
| HÉCTOR RÍOS-ORAMA, | |
| Defendant. | |

<u>**OPINION AND ORDER**</u>

RAÚL M. ARIAS-MARXUACH, United States District Judge

Pending before the Court is Defendant Héctor Ríos-Orama's ("Defendant" or "Ríos-Orama") *Objection to Presentence Report* (the "*Objections*"). (Docket No. 112). For the reasons set forth below, the Court **DENIES IN PART** the *Objections*.

## I.    BACKGROUND

On April 21, 2022, the Grand Jury returned a one-count indictment charging Defendant with carjacking in violation of 18 U.S.C. § 2119(1). (Docket No. 3). On December 6, 2023, the Grand Jury returned a superseding indictment charging Defendant with carjacking resulting in serious bodily injury, in violation of 18 U.S.C. § 2119(2). (Docket No. 98). Three months later, Mr. Ríos-Orama pled guilty to the superseding indictment, not pursuant to any plea agreement. (Docket No. 107).

On April 17, 2024, the United States Probation Office disclosed the Presentence Investigation Report for Mr. Ríos-Orama.

Criminal No. 22-174 (RAM)                                              2

(Docket No. 108). On May 15, 2024, an amended Presentence Investigation Report (the "PSR") and an Addendum containing the objections of the defense and the responses of the assigned Probation Officer were filed. (Docket Nos. 109 and 110, respectively).

As described in the PSR and uncontroverted by the parties, on March 22, 2022, Defendant was present in a shopping center parking lot in San Lorenzo, Puerto Rico. (Docket No. 109 ¶ 6). An elderly woman (the "victim") arrived at the shopping center in her Nissan Pathfinder and parked in front of a store where Mr. Ríos-Orama had been standing. Id. ¶¶ 6, 14. When the victim got out of her car, Defendant called out to her and told her that she failed to properly close the vehicle's door. Id. ¶ 6. The victim attempted to close the Pathfinder's door. Id. In the meantime, Mr. Ríos-Orama ran toward her, pressed a fake pistol to her, and struggled with her. Id. He took the victim's car keys away and tossed her to the ground, at which point he also took her purse. Id. The victim stated that Mr. Ríos-Orama had shouted an obscenity at her before taking her bag. Id. Defendant then drove away with her purse and car, and the victim was taken to a hospital to receive medical assistance. Id.

Defendant subsequently filed a Sentencing Memorandum and his formal *Objections* to the PSR. (Docket Nos. 114 and 112,

respectively). As relevant here, Mr. Ríos-Orama's *Objections* can be summarized as follows: <u>First</u>, he avers that the victim suffered only a serious bodily injury, warranting a four-level sentencing enhancement, and not a permanent or life-threatening bodily injury, which would require a six-level enhancement. Docket No. 112 at 3-8. <u>Second</u>, he contends that the vulnerable victim enhancement is inapplicable. <u>Id.</u> at 9-10.[1]

The United States of America (the "Government") filed its *Response in Opposition* on May 22, 2024 with detailed argumentation as to Defendant's *Objections*. (Docket No. 119). A sentencing hearing was originally scheduled for June 12, 2024. (Docket No. 117). At the hearing, the Government presented evidence, including testimony from the victim's treating physician, Dr. Gisela Puig-Carrión (Dr. Puig-Carrión).[2] *See* (Docket No. 123). Mr. Ríos-Orama also submitted an exhibit. (Docket No. 124).

---

[1] Mr. Ríos-Orama had previously lodged another objection, as documented in the Addendum to the PSR. *See* (Docket No. 110 at 4). However, he withdrew this fourth objection prior to sentencing. (Docket No. 112 at 2 n.1). Moreover, Defendant also contested restitution. <u>Id.</u> at 2-3. At the June 12, 2024 hearing, the parties proffered that they were hoping to reach an accord on the issue of restitution, so the Court ordered that any restitution request be submitted within ninety days and noted that if a dispute remained about the restitution amount, a second hearing could be held. *See* 18 U.S.C. § 3664(d)(5).

[2] In the course of Dr. Puig-Carrión's testimony, the Court asked questions during both direct and cross examination to clarify questions and the witness's testimony, which is well within the discretion of the district court. *See* Fed. R. Evid. 614(b) ("The court may examine a witness regardless of who calls the witness"); <u>United States v. Santana-Perez</u>, 619 F.3d 117, 124-25 (1st Cir. 2010) (citing cases and commenting that the court may elicit facts necessary to the clear presentation of issues).

## II.  ANALYSIS

### A. Enhancement for Permanent or Life-Threatening Bodily Injury

The sentencing guidelines increase the offense level "[i]f any victim sustained bodily injury." U.S.S.G. § 2B3.1(b)(3). At issue here is if the victim suffered serious bodily injury, requiring a four-level enhancement, or permanent or life-threatening bodily injury, requiring a six-level enhancement. *See* id. § 2B3.1(b)(3)(B)-(C). The guideline further establishes that "[i]f the degree of injury is between" serious and permanent or life-threatening bodily injury, a court may add five levels. Id. § 2B3.1(b)(3)(E). A district court determining the extent of a victim's injuries must make a "fact dominated evaluative judgment." United States v. Newman, 982 F.2d 665, 671 (1st Cir. 1992). It need not rely on live testimony to make this judgment; medical reports and information in the presentence investigative report may suffice. United States v. Ramirez-Burgos, 114 F.3d 1170 (1st Cir. 1997) (unpublished).

"'Permanent or life-threatening bodily injury' means injury involving a substantial risk of death; loss or substantial impairment of the function of a bodily member, organ, or mental faculty that is likely to be permanent; or an obvious disfigurement that is likely to be permanent." U.S.S.G. § 1B1.1 cmt. 1(K). In deciding whether the enhancement applies, a sentencing court may

increase the total offense level by six if it determines **either** that the injury is permanent, such that it cannot be healed by time, **or** that it is so serious that it actually threatened the victim's life. *See* United States v. Medlin, 65 F.4th 326 (6th Cir. 2023) (considering a similar provision in the sentencing guidelines for kidnapping, U.S.S.G. § 2A4.1(b)(2)). By contrast, "'[s]erious bodily injury' means injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." Id. § 1B1.1 cmt. 1(M).

In the instant case, the Probation Officer imposed the six-level enhancement for permanent or life-threatening bodily injury because the victim suffered a heart attack and a broken finger from the carjacking. (Docket No. 109 ¶ 24 n.7). Defendant objected on two main grounds: first, that the victim's current heart condition is not causally connected to the instant offense,[3] and second, that any injuries she suffered are not permanent or life-threatening. (Docket No. 112 at 3-8).

---

[3] As discussed *infra*, Mr. Ríos-Orama later conceded that the victim's May 22, 2022 heart attack was caused by the carjacking.

i.  <u>Evidence regarding the heart attack</u>

As reflected in the PSR, the victim was taken to the hospital the same day as the carjacking, and she remained there for approximately four days. (Docket No. 109 ¶ 24 n.7). The hospital paperwork submitted by the parties suggests that initially, the victim experienced "immediate chest discomfort, constant, that lasted several minutes [and] resolved on its [ow]n, non-radiating." (Docket No. 119-2 at 1). Additionally, she had "normal heart sounds, regular rate, regular rhythm," and "[n]o chest pain at the moment of evaluation." <u>Id.</u> at 2. Her cardiac enzymes were measured during her stay. Although a normal value of these enzymes is 0-14 pg/mL, the victim's level was 175 pg/mL on March 22, 2022 at about 4:50pm; 1,517 pg/mL on March 23, 2022 at about 3:45am; and 1,167 pg/mL on March 23, 2022 at about 11:57am. <u>Id.</u> at 6-8. Other paperwork, including documents dated March 24, 2022 and March 26, 2022, indicate that she had a diagnosis of acute coronary syndrome ("ACS") and non-ST-elevation myocardial infarction ("NSTEMI"). <u>Id.</u> at 12, 14-15.

Additionally, a summary sheet dated March 26, 2022, includes a box labeled "Recovered" that is checked. <u>Id.</u> at 15. Dr. Puig-Carrión testified that, although she had not created the medical record in question, "Recovered" could mean that cardiac enzyme levels had returned to normal and that the patient was not

presenting new symptoms. Defendant furthered proffered a section of a medical report dated March 26, 2022, that cardiac rehabilitation had not been ordered.

Prior to the carjacking, the victim had been seeing a cardiologist since June 29, 2016 for chest pain and palpitations. (Docket No. 119 at 5). Records show that her heart's ejection fraction ("EF"), which is a measurement of how much blood pumped by the left ventricle with each contraction, was within a normal range in July 2016, December 2019, and January 2020. (Docket No. 119-3 at 1-4). The medical records from these dates were reviewed by Dr. Puig-Carrión,[4] who testified that they indicate the victim had a normal and healthy heart for a woman of her age. In December 2019, the victim self-reported a family history of heart disease and hypertension, as well as cardiovascular symptoms such as shortness of breath, chest pain, and irregular heartbeat. (Docket No. 124-1 at 2). Dr. Puig-Carrión stated that based on this questionnaire, a further physical examination would have been conducted. Indeed, a stress test conducted in January 2020 yielded results suggesting that the victim's heart was functioning normally. (Docket No. 119-3 at 4).

---

[4] Dr. Puig-Carrión is an advanced heart failure and transplant cardiologist. She has multiple degrees in medicine and cardiology. In addition to maintaining her own private practice, she is also an assistant professor at the University of Puerto Rico's school of medicine.

Criminal No. 22-174 (RAM)                                              8

After the carjacking, the victim visited Dr. Puig-Carrión on December 5, 2022. The cardiologist took notes regarding the victim's history, ordered further studies and labs, and reviewed the victim's medical records. A follow-up was conducted on January 27, 2023, and the records from that date detail that the victim's EF was below the normal range. Further, given the victim's history, Dr. Puig-Carrión documented that an "NSTEMI type 2 [was] possible after above history and stressful episode w/ asso[]ciated trauma to chest vs. possible Takotsubo . . . will start optimal medical therapy." (Docket No. 119-4 at 2). The doctor prescribed five different medications for the victim to help her manage her heart condition, and specifically to help her heart pump more efficiently. *See* id. at 2-3. On February 16, 2023, a cardiac MRI was performed, indicating that the victim's EF had returned to a normal range. Id. at 4.

Dr. Puig-Carrión opined that it made "complete sense" that the victim suffered a myocardial infarction after the carjacking given the victim's history. Based on how the victim's heart responded to the prescribed medication, the cardiologist concluded that the victim had experienced stress cardiomyopathy caused by a very stressful event. Takotsubo is another name for stress cardiomyopathy, which can be caused by a stressful event such as the death of a child or another emotionally destabilizing

occurrence. When this occurs, the patient may suffer from a transient depressed EF or heart failure; the depressed EF can cause the heart muscle to stress, resulting in the leakage of cardiac enzymes. Due to the victim's positive cardiac enzymes, Dr. Puig-Carrión was "totally sure" that she suffered from stress cardiomyopathy.

Furthermore, Dr. Puig-Carrión stated that the reduction in the EF of an approximately seventy-year-old woman who had suffered an NSTEMI would increase the possibility of mortality. In other words, the doctor concluded that the heart attack was a life-threatening event for the victim. Additionally, the cardiologist noted that the victim has not recovered from the heart attack, as she continues to have a depressed EF and must continue treatment as well as a combination of medications for the rest of her life.

Dr. Puig-Carrión also testified that anyone, even a perfectly healthy person, could suffer from heart conditions, although a stressful event causes additional risk. Moreover, she agreed that heart conditions can progress and become worse with age.

ii. <u>The heart attack would not have occurred but for the carjacking</u>

At the June 12, 2024 hearing, Defendant conceded that the victim had suffered a heart attack on March 22, 2022, and that the heart attack was caused by the carjacking. However, even if no

such concession had been made, the Court would note that there was
sufficient evidence in the record to sustain a causation finding.
*See* United States v. Blakely, 999 F.2d 1579, 1993 WL 307926, at
*2 (5th Cir. 1993) (affirming district court's reliance on the PSR
and victim's testimony to establish causation when defendant did
not rebut with any reliable evidence). First, the hospital records
beginning the day of the carjacking show the victim experienced an
NSTEMI and had elevated cardiac enzymes. Second, Dr. Puig-Carrión
testified that it was more likely than not that the stress of the
carjacking caused the victim's stress-induced cardiomyopathy.
Finally, although there was evidence presented that the victim had
prior chest pain and other health issues predating the carjacking,
the January 2020 stress test indicated her heart was in normal
condition.

        iii. The heart attack was life-threatening

    Whether an injury is life-threatening or not is viewed at the
time of the injury and not after the victim has received medical
treatment. United States v. Whitehorne, 141 F.3d 1186 (table) (10th
Cir. 1998) (unpublished) (finding stabbing where victim lost an
amount of blood that could have resulted in cardiac arrest or death
was life-threatening). In the instant case, the victim suffered a
heart attack—specifically, a NSTEMI—soon after the March 22, 2022
carjacking. Her cardiac enzymes were elevated, which Dr. Puig-

Carrión testified could increase the risk of mortality. The victim also had to remain hospitalized for several days. Given these uncontested facts in the record, the Court finds that the heart attack was life-threatening and warrants a six-level enhancement under the Guidelines.

This conclusion is supported by persuasive authority from other circuits. For example, in United States v. Young, the Eleventh Circuit considered a case involving a victim who suffered a heart attack and, like the victim in this case, had to be taken by ambulance to the hospital, was hospitalized for four days, and needed to remain on medication for the rest of her life. 144 Fed. App'x 33, 36 (11th Cir. 2005) (unpublished). The Eleventh Circuit affirmed the district court's conclusion that "**even a relatively minor heart attack is an injury involving a substantial risk of death.**" Id. (citation omitted and emphasis added); *see also* United States v. Bennett, 143 Fed. App'x 200 (11th Cir. 2005) (unpublished) (holding the same in a related case); United States v. Mitchell, 366 F.3d 376 (5th Cir. 2004) (affirming six-level enhancement when victim suffered a stroke during a bank robbery). *Contra* United States v. Stamper, 91 Fed. App'x 445, 464 (6th Cir. 2004) (unpublished) (applying a two-level enhancement for bodily injury when the record was silent as to the medical treatment the victim received for his heart condition).

Given the record before the Court, the Defendant's *Objections* as to whether the heart attack was a life-threatening injury are **DENIED.** A six-level enhancement pursuant to U.S.S.G. § 2B3.1(b)(3)(C) is therefore appropriate in this case.

### iv. The Court need not determine whether the heart attack caused a permanent injury

An impairment that "has not been corrected by the time of sentencing, and will last for life unless surgically corrected . . . should be treated as permanent . . . unless future correction would be a straightforward procedure." United States v. Webster, 500 F.3d 606, 608 (7th Cir. 2007) (internal quotation marks omitted); Medlin, 65 F.4th at 333 (same). The enhancement applies to injuries that may not be particularly severe but are nevertheless permanent. United States v. Price, 149 F.3d 352, 354 (5th Cir. 1998). Additionally, a treating physician's medical opinion regarding the permanence of a victim's injuries can support a six-level enhancement. *See* United States v. Torrealba, 339 F.3d 1238, 1246 (11th Cir. 2003), *cert. denied*, 540 U.S. 1207 (2004).

Here, Defendant elicited testimony during cross-examination of Dr. Puig-Carrión that it is possible for heart conditions to deteriorate with time. The Court also considers the fact that the victim was released from the hospital on March 26, 2022, without any medical orders requiring further cardiac rehabilitation. On

the other hand, Dr. Puig-Carrión testified that the victim will
need to remain on several heart medications for the rest of her
life to enable her EF to remain normal. Furthermore, the
cardiologist also said that the victim would need to be monitored
permanently. Given that the Court has already found that the heart
attack on March 22, 2022 was life-threatening, it is unnecessary
to further determine whether the injury also was permanent. Thus,
the six-level enhancement is sustained only on grounds that the
heart attack was life-threatening.

     v.   <u>Additional injuries</u>

    During the carjacking, Defendant twisted the victim's finger
while wrestling car keys from her. (Docket No. 109 ¶ 24 n.7). In
doing so, he broke the middle finger of her right hand. <u>Id.</u>
Defendant contends that the broken finger represents a serious
bodily injury but notes that there is no documentation outside of
the victim's own impact statement that the injury is permanent.
(Docket No. 112 at 5). However, a district court may consider a
victim impact statement if it is reliable and, as relevant here,
translated into the English language. *See* <u>De Jesús-Torres</u>, 64 F.4th
at 44 n.4. In this case, the victim explained in her impact
statement, dated April 5, 2024 and made under penalty of perjury,
that she has difficult writing in cursive because she cannot fully
close her hand, and she cannot perform certain household chores

such as opening containers. (Docket No. 119-1 at 16, 19). Because the Court has already found that the heart attack suffered by the victim constituted a life-threatening injury, there is no need to determine whether the broken finger is also a permanent injury that warrants a six-level enhancement.

Furthermore, although the victim's back injuries are raised by Defendant in his *Objections*, neither the Probation Officer nor the Government claim that the injuries to the victim's back warrant an enhancement for permanent or life-threatening bodily injury. Because this issue is uncontested and does not affect the application of the six-level enhancement, the Court also need not address this objection.

**B. Vulnerable Victim Enhancement**

Defendant claims a two-level vulnerable victim enhancement should not apply because there is no support in the record showing he knew or should have known that the victim in this case was particularly vulnerable. (Docket No. 112 at 9). Mr. Ríos-Orama also objects to the enhancement because the nexus requirement is unsatisfied. Id. At the time of the offense, the victim was 74 years old,[5] stood 5'03" tall, and weighed approximately 114 pounds. (Docket No. 109 ¶ 26 n.8); *see also* (Docket No. 119-5). These facts

---

[5] *See* (Docket No. 58-2 at 3) (noting victim's age on the date of the offense).

are uncontested, and the Probation Officer relied on them to impose the enhancement because the victim's petite stature and age made her "substantially less able than the average citizen to protect herself against the crime." Id.

To apply the vulnerable victim enhancement, U.S.S.G. § 3A1.1(b) requires that: (1) the victim is a "vulnerable victim," meaning "a person . . . who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct," and (2) "the defendant knew or should have known that a victim of the offense was a vulnerable victim." Id. cmt. 2; see also United States v. Chin, 41 F.4th 16, 26 (1st Cir. 2022) (citations omitted) (requiring sentencing court to determine if the victim had an impaired capacity to detect or prevent crime).

### i.   The nexus requirement

Defendant contends that, in addition to what is explicitly required by the text of the Guideline, § 3A1.1(b) further imposes a "nexus" requirement that is "based on the general limitation that a sentencing court base its finding of unusual vulnerability on individualized findings of particular susceptibility, rather than on the victim's membership in a large class." (Docket No. 112 at 9); see also United States v. Donnelly, 370 F.3d 87, 93 (1st Cir. 2004). However, the First Circuit has held that "[s]ince the

nexus test is already a part of our analysis of whether the victim is a vulnerable victim under section 3A1.1, we find that it would be superfluous to incorporate a third, independent nexus prong into our discussion of the applicability of the vulnerable victim enhancement." Id. (internal quotations omitted).

While Defendant correctly interprets the nexus requirement to instruct the Court to focus "on the victim's individual characteristics . . . above and beyond mere membership in a large class," United States v. Feldman, 83 F.3d 9, 15 (1st Cir. 1996), the First Circuit clarified in United States v. Gill that the nexus requirement "is in no way a fixed rule," and "**[i]n some cases the inference to be drawn from the class characteristics may be so powerful that there can be little doubt about unusual vulnerability of class members within the meaning of section 3A1.1.**" 99 F.3d 484, 486-87 (1st Cir. 1996) (emphasis added). In some cases, like this one, "many inferences about an individual rest on an implicit generalization about a class." Id. (discussing application of class characteristics to cases involving one victim). Moreover, "the vulnerability that triggers § 3A1.1 must be an 'unusual' vulnerability which is present in only some victims of that type of crime." United States v. Davis, 967 F.2d 516, 524 (11th Cir.

1992).[6] As relevant here, the enhancement would be applicable to "a robbery in which the defendant selected a handicapped victim." U.S.S.G. § 3A1.1 cmt. 2.

### ii.  The targeting requirement

Defendant avers there is also a "targeting" requirement for applying the vulnerable victim enhancement and that this requirement is unsatisfied insofar as he did not select or target the victim because of her vulnerabilities. (Docket No. 112 at 9). The targeting requirement originated in an older version of § 3A1.1 and its attending commentary, stating the enhancement applied "to offenses where an unusually vulnerable victim is made a **target** of criminal activity by the defendant." Id. cmt. 1. (1994) (emphasis added). However, the relevant Guideline and its Application Notes have since been revised, and the targeting requirement is no longer included.[7] The First Circuit has stated "an additional requirement of 'targeting,' even under the pre-amendment guideline, is **at odds with the evident purpose** of the guideline: to punish more severely

---

[6] This limitation distinguishes those crimes that inherently involve victims who possess characteristics that make them vulnerable to that particular crime. The vulnerable victim enhancement is inapplicable "if the factor that makes the person a vulnerable victim is incorporated in the offense guideline. For example, if the offense guideline provides an enhancement for the age of the victim[.]" U.S.S.G. § 3A1.1 cmt. 2.

[7] The current language provides that "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels." U.S.S.G. § 3A1.1(b)(1).

conduct that is morally more culpable and to protect such victims by adding more deterrence." <u>Gill</u>, 99 F.3d at 488 (emphasis added). Other circuit courts have adopted the same interpretation, excising the targeting requirement. *See* <u>United States v. Birge</u>, 830 F.3d 1229, 1231 (11th Cir. 2016); <u>United States v. O'Brien</u>, 50 F.3d 751, 755 (9th Cir. 1995); <u>United States v. Aldridge</u>, 98 F.4th 787, 797 (6th Cir. 2024). Thus, Defendant's inclusion of an additional element in the application of the vulnerable victim enhancement is unsupported.

### iii. <u>Whether the victim was vulnerable</u>

In determining whether the victim was vulnerable, the Court must assess whether the victim's individual characteristics make her "**substantially less able than the average citizen to protect themselves[.]**" <u>Gill</u>, 99 F.3d at 486 (emphasis added). This inquiry is best addressed by the sentencing judge. *See* <u>United States v. Mejia-Orosco</u>, 868 F.2d 807, 809 (5th Cir. 1989), *cert. denied*, 492 U.S. 924 (1989) ("'vulnerability' is the sort of fact which the trial court is particularly well-positioned to gauge, particularly in instances when the trial court has had an opportunity to observe the victim in court."). As relevant to violent crimes, elderly persons who are alone "are usually less capable of resisting physical attack than the younger." <u>United States v. Williams</u>, 258 F.3d 669, 673 (7th Cir. 2001).

At the June 12, 2024 hearing, Defendant conceded that the victim was a vulnerable victim given her age. Additionally, the Court has considered a photograph of the victim and a surveillance video of the carjacking. The victim is an elderly woman with a slight build. Her age and stature are not characteristics inherent to all victims of a carjacking, but instead are only present in a few who find themselves victims of that crime. These characteristics also likely impaired her ability to detect or prevent the carjacking. Furthermore, neither age nor infirmity are incorporated in the offense guidelines. *See* 18 U.S.C. § 2119(2). Accordingly, the victim in this case was vulnerable or otherwise particularly susceptible to criminal conduct.

      iv.   <u>Whether Defendant knew or should have known the victim was vulnerable</u>

The remaining issue for applying the vulnerable victim enhancement is whether Mr. Ríos-Orama "knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). Defendant claims this requirement is unsatisfied because he was so under the influence of a controlled substance, namely fentanyl, that he was not aware of the victim's vulnerabilities. (Docket No. 112 at 10). He further avers that had he been in his right mind, he never would have committed the instant offense. <u>Id.</u>

However, "at common law, as a general rule, voluntary intoxication affords no excuse, justification, or extenuation of a crime committed under its influence[.]" Robinson v. Ponte, 933 F.2d 101, 105 (1st Cir. 1991) (citing Hopt v. People, 104 U.S. 631, 633 (1881)). Additionally, "[d]ue process does not require that the jury consider voluntary intoxication when a defendant's state[] of mind is at issue." Chaleumphong v. Fico, 429 F. Supp. 2d 410, 422 (D. Mass. 2006) (citing Montana v. Egelhoff, 518 U.S. 37, 56 (1996)); see also United States v. Lopez-Ortiz, 875 F.3d 49, 54 (1st Cir. 2017) ("Proof that one acts due to addiction . . . is not proof that one acts involuntarily."). Application of the vulnerable victim enhancement requires the Court to "focus on the victim's unusual vulnerability," rather than the defendant's characteristics. United States v. Salemi, 26 F.3d 1084, 1088 (11th Cir. 1994) (overruling the lower court's determination that the defendant's "mental and emotional condition clouded his ability to perceive the [victim]'s peculiar vulnerability."). Mr. Ríos-Orama does not offer any reason to find otherwise.

In United States v. Billingsley, the Seventh Circuit considered a case with a similar fact pattern. 115 F.3d 458, 464 (7th Cir. 1997). The panel held that the defendant "knew" or "should have known" that the victim, an 82-year-old man physically assaulted during a carjacking, was vulnerable since the defendant

"had the opportunity to observe [the victim] walking from his garage to the back door of his house before engaging him in a direct physical attack." Id. at 463-64.

The facts of the present case closely resemble those in Billingsley. The security camera footage shows that Defendant had a significant opportunity to observe the victim as she parked and initially walked away from her car. Mr. Ríos-Orama also called out to the victim after noticing her driver-side door was ajar. (Docket No. 109 ¶ 6). Assuming *arguendo* that he did not observe the victim's vulnerable characteristics from a distance, he should have known that she was elderly and frail upon grabbing her and wrestling for her keys. Moreover, Defendant insulted the victim using gendered language,[8] indicating he was sufficiently able to observe she was a woman. *See* id. ¶ 23 n.6. Like the defendant in Billingsley, Mr. Ríos-Orama had time to observe the victim as she parked and left her car, and then again while he was physically attacking her.

Because the victim was vulnerable and the facts demonstrate that the Defendant knew or should have known of her vulnerability,

---

[8] Specifically, the Government avers Mr. Ríos-Orama used the phrase "*canto de cabrona, dame la cartera*," and translates it informally as "you bitch, give me the purse!" (Docket No. 119 at 4). The Court notes that in her Victim Impact Statement, the victim wrote that Mr. Ríos-Orama had said "*canto de puta dame la cartera*," which was officially translated as "give me the purse you fucking whore." (Docket No. 119-1 at 5-6, 18). In any case, both epithets would refer to a female individual.

Criminal No. 22-174 (RAM)                                    22

the Court **DENIES** Defendant's objection to the application of the
vulnerable victim enhancement.

### III. CONCLUSION

For the foregoing reasons, the Court **DENIES IN PART**
Defendant's *Objection to Presentence Report* at Docket No. 112 as
to the enhancements for permanent or life-threatening injury and
vulnerable victim. The Court will not address restitution or the
factors listed under 18 U.S.C. § 3553(a) at this time.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 26th day of June 2024.

s/Raúl M. Arias-Marxuach
UNITED STATES DISTRICT JUDGE